# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**TIMOTHY PAUL CUSSON,**                                    Chapter 7
    Debtor                                              Case No. 13-17062-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**WARREN E. AGIN, CHAPTER 7 TRUSTEE**,
    Plaintiff,
v.                                                         Adv. P. No. 15-1013
**TIMOTHY PAUL CUSSON**,
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the First Amended Complaint filed by the Plaintiff, Warren E. Agin, the Chapter 7 Trustee (the "Trustee") of the Estate of Timothy Paul Cusson (the "Defendant" or the "Debtor"). Pursuant to his First Amended Complaint, the Plaintiff sought the entry of an order denying the Defendant a discharge under 11 U.S.C. § 727(a)(2)(A) (Count I), (a)(2)(B) (Count II), (a)(3) (Count III), (a)(4)(A) (Count IV), (a)(4)(D) (Count V), and (a)(5) (Count VI). The Defendant answered the Trustee's First Amended Complaint, and the Court, following the submission of a Joint Pretrial Memorandum, conducted a pretrial conference. At the pretrial conference held on February 3, 2016, the Plaintiff waived claims for relief set forth in Counts I, III, and V. In

1

his post-trial Brief, however, the Trustee did not address § 727(a)(5), and, therefore, waived Count VI as well.

The Court conducted a trial on June 8, 2016 and June 9, 2016 at which three witnesses testified, including Joseph J. Czerwonka, Esq. ("Attorney Czerwonka"), the Debtor's counsel in the main case, the Trustee, and the Debtor. The parties introduced eighty-seven (87) exhibits into evidence.

The issue presented is whether the Trustee sustained his burden of proof under § 727(a)(2)(B) or (a)(4)(A), which required him to establish by a preponderance of the evidence that the Debtor either "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property . . . concealed . . . property of the estate, after the date of the filing of the petition," or "knowingly and fraudulently, in or in connection with the case - . . . made a false oath or account," respectively. For the reasons set forth below, the Court concludes that the Trustee failed to sustain his burden of proving that the Debtor is not entitled to a discharge under either § 727(a)(2)(B) or (a)(4)(A).

In his opening statement, the Trustee represented that "the primary gravamen of the claim is that there were three concealed matters. . . ." Specifically, in his opening statement, the Trustee summarized his asserted grounds for denial of the Debtor's discharge as follows:

> [A]n arrangement that the debtor had with a fellow name[d] Mr. Peck and an entity called the Maddie Drive Realty Trust [sic] where they had arranged for an entity called Colby Village to engage in a friendly foreclosure with Maddie Drive Realty Trust [sic], after which the debtor or an entity that he called, called CBS Consulting [sic], or his wife would

receive a lot of property in the development that was foreclosed. . . . The documents we have indicate that it was supposed to be transferred to CBS Associates, which essentially is an alter ego of Mr. Cusson and that the transfer occurred simply because CBS Associates had [been] involuntarily dissolved by the Secretary of State's Office prior to filing.  We actually sued Jennifer Cusson for return of that lot to the estate and that lawsuit resulted in her conveying the lot into the estate where it was eventually sold. So the property of the estate that was concealed was the -- was the lot.[1]

The second I think and also significant is the debtor had prior to 2009 through CBS Associates owned a 25 percent interest in a company called Commodity Management, LLC. Commodity Management, LLC owned a trucking contract, essentially the right to provide trucking services to a company called Parallel Products, which was the debtor's employer. In 2009 Commodity Management, LLC, sold that trucking contract and -- for a substantial sum of money and as a result CBS Associates received in 2009 and 2010 over $200,000. At its 341 meeting the debtor claimed that he had no clue what Commodity Management was, had no clue what the funds then he failed to provide after multiple inquiries any information to the Trustee regarding what this entity was. And at the end of the day the Trustee had to conduct a 2004 examination of the debtor's accountant to obtain the information acquired. So this relates to Count IV, which is a false oath or account.

And the third thing we're going to focus on is a company called YAM, LLC. The debtors through CBS Associates owned a small interest in a company called LLC. He'd made approximately a $10,000 investment many years earlier and YAM, LLC owned stock in a company called Powers, which is a small start-up dealing with technology solutions in the shipping industry. At the time of the file -- a couple of months before the filing YAM, LLC had transferred the interests in Powers into a company run by Mr. Cusson's accountant, the name of which -- just a second -- is Strategic Capital Management, LLC. That transfer occurred, according to the testimony or deposition transcript, occurred because the stock at that point was considered to have nominal value and they didn't want to pay the costs of maintaining YAM, LLC anymore, but the -- Mr. Newburg, the accountant

---

[1] The Trustee's Complaint against Jennifer Cusson was resolved by way of a Stipulation. The recitals in the Stipulation included a recognition that Jennifer Cusson disputed the Trustee's allegations.  As noted below, the Trustee eventually sold the lot for $8,800.00, thereby permitting an inference that the costs to defend the Trustee's action by Jennifer Cusson outweighed any benefit to her from the sale of the lot after the payment of legal fees and costs of sale.

who controlled the holding company Strategic, Strategic Capital Management still considered the original owner's LLC, YAM, LLC, to be the equitable owners.  So as a result at the time of the filing, Mr. Cusson actually indirectly owned this interest in YAM, LLC and he had signed the documents to effect the transfer to Strategic literally a couple of months before he filed his bankruptcy petition, despite this at his 341 meeting he expressed to have no knowledge about what YAM, LLC might be. And as before, we -- despite many efforts he would not provide that information, we eventually obtained it as a result of a subpoena sent to his accountant. And that goes to Count II, which is the interest in YAM, LLC indirectly through CBS Associates having been concealed from the estate and Count IV being a false oath or account.

In his post-trial brief, the Trustee did not mention YAM, LLC or any interest the Debtor may have had in that entity or indirectly in Powers International, LLC, a limited liability company owned by YAM, LLC.  Accordingly, the Court concludes that the Trustee waived Counts II and IV with respect to any interests the Debtor may have or had in YAM, LLC and Powers International, LLC.

The Court now makes the following findings of fact and rulings of law pursuant to Fed. R. Bankr. P. 7052.

## II. FACTS[2]

The Debtor filed a voluntary Chapter 7 petition on December 7, 2013, declaring under the penalty of perjury that the information provided in his petition was true and correct.  In addition, on December 7, 2013, the Debtor signed and filed with the Court, a Declaration of Electronic Filing, declaring under penalty of perjury that all of the

---

[2] The parties submitted a Joint Pretrial Memorandum in which they set forth ninety-two (92) stipulated facts.  The Court incorporates those facts in its findings of fact.

information filed electronically with the court was true and correct.[3]  At the time the Debtor filed his Chapter 7 petition, he was represented by Attorney Czerwonka.  The Debtor testified that a lawsuit filed against him and others by James and Mary Novick in June of 2009 precipitated the filing of his bankruptcy petition.[4]

On December 11, 2013, this Court issued a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors & Deadlines.  The notice was transmitted to all creditors, informing them that the meeting of creditors was scheduled for January 15, 2014 and that the deadline to object to the Debtor's discharge or the dischargeability of certain debts was March 17, 2014.  Both the Trustee and the United States trustee filed motions seeking extensions of the March 17, 2014 deadline for filing complaints under 11 U.S.C. § 727.  Although several creditors appeared and questioned the Debtor at the initial meeting of creditors, including counsel for the Novicks, no creditors filed complaints or motions to extend the deadline for filing such complaints under 11 U.S.C. § 523 or 727.[5]

---

[3] The Court takes judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

[4] The parties agreed that the Debtor had been a defendant in a lawsuit brought by the Novicks in connection with a real estate project called Roads Cross, LLC and that the Novicks claimed that the Debtor owes them at least $125,000, plus punitive damages and attorney's fees under Mass. Gen. Laws Ch. 93A.  They also agreed that, on September 24, 2009, and again on March 18, 2011, the Debtor was sued by National Lumber Company which filed a proof of claim in the Debtor's bankruptcy case claiming the Debtor owes it $75,879.81 for goods purchased on or before February 13, 2009, including accrued interest.

[5] James and Mary Novick commenced an action against the Debtor in the Bristol Superior Court, Department of the Trial Court in June of 2009.  The Novicks filed a proof of claim in the Debtor's bankruptcy case to which they attached a writ of attachment, dated June

On January 10, 2014, the Debtor signed and filed with the court his original schedules, declaring under penalty of perjury that he had read the schedules and that they were true and correct to the best of his knowledge, information and belief.  On the same day, he signed and filed with the court his statement of financial affairs, declaring under penalty of perjury that he had read the statement of financial affairs, and that they were true and correct.

On Schedule A-Real Property, the Debtor listed his primary residence located at 46 Eliza Lane, North Dartmouth, Massachusetts with a value of $400,000, subject to a secured claim in the amount of $346,424.16.  On Schedule B-Personal Property, the Debtor listed, among other assets, a checking account at Webster Bank and the following:

Cedar Dell, LLC.
38 Edmund Street, East
Providence, RI 02914

Roads Cross, LLC.
651 Orchard Street
New Bedford, MA. 02744

CBS Consulting Associates, Inc.
651 Orchard Street
New Bedford, MA. 02744

He ascribed an unknown value to Cedar Dell, LLC and no value to Roads Cross, LLC and CBS Consulting Associates, Inc.

---

5, 2009, against the Debtor's personal residence located at 46 Eliza Lane, Dartmouth, Massachusetts, as well as the "goods or estate" of Roads Cross, LLC "to the value of $125,000.00."  On January 3, 2013 the Superior Court issued a Memorandum of Decision and Order on Plaintiffs' Summary Judgment Motion granting summary judgment in favor of the Novicks with respect to their two-count complaint for breach of contract and violation of Mass. Gen. Laws ch. 93A, while indicating its intent to conduct further proceedings as to damages, attorney's fees and costs.

On Schedule D-Creditors Holding Secured Claims, the Debtor listed, among other creditors, James and Mary Novick with a claim in the amount of $125,000 and National Lumber Company with a claim in the sum of $55,000 both secured by his Elza Lane residence.

On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed ten creditors with claims totaling $725,583.88.  The Debtor listed eight of those claims as contingent, unliquidated and disputed.  The Debtor also listed his father, Paul Cusson, as a co-debtor with respect to ten claims, including the secured claims he listed on Schedule D, and his mother, Nancy Cusson, as a co-debtor with respect to one secured claim.

On Schedules I: Your Income and J: Your Expenses, the Debtor identified his employer as Parallel Environmental Services Corp. ("Parallel") and listed his gross monthly salary as $10,399.88.  In response to Questions 1 and 2 on the statement of financial affairs regarding "Income from employment or operation of business" and "Income other than from employment or operation of business," respectively, the Debtor listed the following:

| AMOUNT | SOURCE |
|---|---|
| $173,420.00 | 2012 Business Income |
| $176,124.00 | 2011 Business Income |

| AMOUNT | SOURCE |
|---|---|
| $9,938.00 | 2012 Cerebral Palsy of Massachusetts |
| $9,940.00 | 2011 Cerebral Palsy of Massachusetts |

In response to Question 18(a) on the statement of financial affairs, which requires individual debtors to "list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor

was an officer, director, partner, or managing executive of a corporation, partner in a

partnership, sole proprietor, or was self-employed in a trade, profession, or other activity

either full- or part-time within six years immediately preceding the commencement of

this case, or in which the debtor owned 5 percent or more of the voting or equity securities

within six years immediately preceding the commencement of this case," the Debtor set

forth the following:

| NAME | TAXPAYER-I.D. NO. | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|---|---|---|---|---|
| Cedar Dell, LLC | | 38 Edmund Street East Providence, RI 02914 | Real Estate Development | Active |
| Road Cross, LLC. | 1049 | 651 Orchard Street New Bedford, MA 02744 | Real Estate Development | Active |
| CBS Consulting Associates, Inc. | | 651 Orchard Street New Bedford, MA 02744 | Consulting | Active |
| Azelea [sic] Drive, LLC | | | | Dissolved 06/30/2013 |
| Colby Village, LLC. | | | | Dissolved 06/30/2013 |
| Aces Landing, LLC. | | | | Dissolved 04/19/2011 |
| Woodland Hills, LLC. | | | | Dissolved 04/19/2011 |

Neither the Debtor's schedules nor his statement of financial affairs contain any

references to Commodity Management, LLC ("Commodity Management"), Yam, LLC,

or any transfers of real estate or interests of CBS Consulting Associates, Inc. or CBS

Consulting Associates, LLC to the Debtor's wife, Jennifer Cusson.

On January 15, 2014, the Debtor appeared and was examined under oath by the

Trustee at a 341 meeting of creditors (the "Initial 341 Meeting").   At the Initial 341

Meeting, the Debtor testified that he signed the petition, schedules and statement of

financial affairs.  In addition, he testified that he read all the documents before he signed them, and that they were accurate and complete.

On February 27, 2014, the Debtor appeared and was examined under oath at a continued 341 meeting of creditors (the "Second 341 Meeting").  At the Second 341 Meeting, the Debtor again testified that he signed the petition, schedules and statement of financial affairs.  He also testified that he read all the documents before he signed them, and they were accurate and complete.  At the Second 341 Meeting, the Debtor testified that he had listed all of his assets, and listed all of his financial information in the statement of financial affairs.

At the time of the Second 341 Meeting, the Debtor, who attended one semester of college and began his career as a laborer in the waste management business, testified that he is now Vice-President of Business Development for Parallel.  Prior to joining Parallel, the Debtor worked as a plant manager for different recycling companies, managing between fifteen and twenty employees.  He also was involved with his father in the real estate development business, specializing in so-called Chapter 40B projects.

On April 7, 2014, the Debtor filed an amended schedule C-Property Claimed as Exempt.  On April 15, 2014, the Debtor filed an amended summary of schedules in his case.  The Debtor has not otherwise amended his schedules or statement of financial affairs.

Approximately ten years before he filed his Chapter 7 bankruptcy case, in 2003, the Debtor organized a Massachusetts limited liability company named CBS Consulting Associates, LLC.   He also incorporated a Massachusetts corporation named CBS

9

Consulting Associates, Inc.  The Debtor, at all times, did not distinguish between CBS Consulting Associates, LLC and CBS Consulting Associates, Inc., and never treated them as separate entities.  Although the Debtor did not distinguish between the two entities, there was no evidence that his creditors considered the Debtor the alter ego of one or both entities.  From 2009 to 2012, the Debtor maintained an account in the name of CBS Consulting Assoc. Inc. at Bank of America, N.A.  He deposited his employment income from Parallel, as well as other income, including consulting income, into that account and also used it to pay personal expenses.  Prior to November 14, 2011, the Debtor was the sole member of CBS Consulting Associates, LLC and the sole stockholder of CBS Consulting Associates, Inc.  The Debtor prepared an Amended Operating Agreement for CBS Consulting Associates, LLC, dated November 14, 2011, to add his wife as a member. The Amended Operating Agreement provided that Jennifer Cusson held a 95% membership interest in CBS Consulting Associates, LLC and the Debtor held the remaining 5% membership interest.  The Debtor prepared the November 2011 Amended Operating Agreement without the involvement of an attorney.

During the bankruptcy case, the Trustee repeatedly requested a copy of the original operating agreement for CBS Consulting Associates, LLC.  The Debtor testified that despite his best efforts he was unable to locate a copy of the original operating agreement.

On April 30, 2009, CBS Consulting Associates, LLC was involuntarily dissolved by the Massachusetts Secretary of State.  On June 18, 2012, CBS Consulting Associates, Inc. also was involuntarily dissolved by the Massachusetts Secretary of State.  CBS Consulting

10

Associates, Inc. terminated activity in 2013, and filed a final federal income tax return for that year.

Prior to 2012, the Debtor owned an interest in Colby Village, LLC ("Colby Village"), which owned a real estate subdivision in New Bedford, Massachusetts. The Community Bank ("Community Bank") held a first mortgage on its real estate. The Debtor was not personally obligated to Community Bank with respect to its mortgage, although Paul Cusson, Colby Village LLC and Delphic Associates, LLC were guarantors of the mortgage debt. In 2011, Community Bank requested the Debtor's assistance in finding a buyer for the subdivision. In response to that request, the Debtor contacted a number of potential buyers, including David Peck ("Peck"). In or around May of 2011, the Debtor prepared and sent to Peck's attorney a draft operating agreement for an unnamed limited liability company (the "LLC"). The Debtor proposed to create the LLC for the purpose of purchasing the mortgage on the Colby Village lots held by Community Bank. The Debtor and Peck were to be the sole members of the LLC, with equal membership interests, and Peck was to be the manager. In addition, the LLC was to enter into purchase and sale agreement with Peck for the sale of lots 3 and 4 at Colby Village, and a purchase and sale agreement with the Debtor for the sale of Lot 6. Peck did not accept that proposal, and the arrangement contemplated by the Debtor was never formalized or performed. Moreover, the Debtor testified that because his father was obligated to Community Bank, the bank objected to his involvement in any acquisition, although it agreed to, and eventually did pay him, a commission of $3,000 with respect to Peck's acquisition of its mortgage.

11

Peck created an entity known as Maddie Drive Realty Associates, LLC ("Maddie Drive"), which, on or about July 22, 2011, offered to buy, and then purchased, the Colby Village mortgage debt from Community Bank. It then initiated foreclosure proceedings with respect to the real estate owned by Colby Village, LLC with Colby Village, LLC's assent. On May 30, 2012, Paul Cusson, as sole manager of Colby Village, LLC, executed an "Acceptance of Service and Consent to Entry of Judgment of Foreclosure," waiving any defense to the foreclosure action and consenting to entry of a judgment of foreclosure. Thereafter, Maddie Drive conducted a "friendly" foreclosure sale on or around September 12, 2012.

According to the Debtor, Peck offered to transfer one of the Colby Village lots to CBS Consulting Associates, Inc., but unbeknownst to the parties at the time, CBS Consulting Associates, Inc. had been dissolved by the Massachusetts Secretary of State. On October 17, 2011, over ten months before Maddie Drive conducted its foreclosure sale and obtained an ownership interest in the subdivision, it executed a "Purchase and Sale Agreement for an Undeveloped Lot of Land" (the "purchase and sale agreement") with respect to a  lot identified as Lot 4A. The purchase and sale agreement was signed by Peck, as Seller in his capacity of manager of Maddie Drive, but it was not signed by the proposed Buyer, namely the Debtor in his capacity as president of CBS Consulting Associates, Inc.  The consideration for the transfer of Lot 4A to CBS Consulting Associates, Inc. set forth in the Purchase and Sale Agreement was that Peck would obtain "the full cooperation of Colby Village, LLC, Delphic Associates, LLC, Paul E. Cusson and Timothy Cusson in permitting the Seller to foreclose on Lots 3A, 4A and 6, Colby Village,

Maddie Drive, New Bedford, Massachusetts, including but not limited to accepting all service of process, not contesting the foreclosure sale (through a bankruptcy petition or otherwise) and not bidding at the foreclosure sale in an amount in excess of the Seller's highest bid," together with mutual releases "of any and all claims concerning the foreclosure sale and the Loan Documents that were assigned to the Seller by The Community Bank" and "the release from any liability for a deficiency of the amount owed under the Note and Mortgage."

In July of 2011, prior to the October 17, 2011 draft purchase and sale agreement between Maddie Drive and CBS Consulting Associates, Inc., the Debtor and John E. Zajac, Esq. ("Attorney Zajac"), Peck's attorney, exchanged emails.  Attorney Zajac emailed the Debtor, stating:  Dave [Peck] tells me that we are moving forward.  The only change is that he would get Lots 6 and 3A and you would get Lot 4A.  Is that your understanding?"  After Maddie Drive purchased the mortgage and conducted a mortgagee's sale of the remaining lots in Colby Village, LLC on September 12, 2012 at which Maddie Drive was the successful purchaser, Attorney Zajac and the Debtor, in late September and early October of 2012, again exchanged emails.  Attorney Zajac emailed the Debtor, asking the following:

> Did you give any further thought as to the consideration for the lot that Dave will convey and/or how you wanted to take title?  Dave would like to put stuff on record next week.  Even though he owns the lots now, he doesn't feel comfortable about starting work until the deeds are recorded.

Later, he advised the Debtor that CBS Consulting Associates, Inc. had been dissolved in June of 2012. The Debtor responded on October 1, 2012, stating: "Sorry back in town let's simply we [sic] will take in the name of Jennifer cusson [sic]. Does that work john. [sic]."

On October 3, 2012, Maddie Drive Realty Associates deeded Lot 4A to Jennifer Cusson, the Debtor's wife. The deed was recorded on October 19, 2012. From January 15, 2013, to April 15, 2013, Lot 4A was marketed for sale by Paul Cusson, with a list price of $79,900 without success. From January 6, 2014, to June 3, 2014, Paul Cusson marketed Lot 4A for sale by with a list price of $69,900 without success.

As noted above, the Trustee commenced an action against Jennifer Cusson and obtained a deed to Lot 4A in settlement of that suit. On July 30, 2015, the Trustee filed an Application to Employ Thomas Weitbrecht, II and Strategic Auction Alliance for the purpose of advertising, preparing for and conducting a public auction of Lot 4A and a Motion for Authority to Sell Lot 4A Maddie Drive, New Bedford, Free and Clear of Liens at Public Auction pursuant to 11 U.S.C. § 363. On August 6, 2015, the Trustee filed a Notice of Intended Public Sale of Lot 4A Maddie Drive. The Trustee proposed to sell Lot 4A, "in 'as is' and 'where is' condition with no warranties or representations whatsoever." In his Notice, the Trustee stated that he was making "no representation regarding whether the Real Estate is buildable." On December 14, 2015, the Trustee sought authority to pay the auctioneer his fees and expenses. The auctioneer reported that he sold Lot 4A for $8,800, which was subject to unpaid real estate taxes, and was entitled to a commission of $880 and reimbursement of expenses in the amount of $1,908.30, yielding approximately $6,000 for the estate, excluding legal fees incurred by

14

the Trustee in commencing the action against Jennifer Cusson and filing the application

to employ an auctioneer, the Motion for Authority to Sell, the Notice of Intended Sale, as

well as the Motion for Order Approving the Fee Application of Tom Weitbrecht and

Strategic Auction Alliance.  Lot 4A does not appear to have been a particularly desirable

lot and, as noted, the Trustee did not warrant it was buildable when he sold it for $8,800,

subject to tax liens.

The Debtor testified at the Second 341 Meeting that he was not affiliated with

Maddie Drive.  The Debtor also testified at the Second 341 Meeting that he did not think

he had ever done any business with Peck.  Moreover, at the Second 341 Meeting, when

asked "[w]hat kind of arrangements did you or your father have with Mr. Peck regarding

the foreclosure sale?" the Debtor testified "[w]e signed a document to let him foreclose."

The full colloquy between the Trustee and the Debtor at the Second 341 Meeting,[6]

occurred as follows:

> TRUSTEE: . . . Do you know this David Peck?
> MR. CUSSON: Yes.
> TRUSTEE:  How do you know him?
> MR. CUSSON: Through business; he's a contractor.
> TRUSTEE: Have you done business with him?
> MR. CUSSON: Did we do - - I don't think we've ever done any business with him, no.
>
> ***
>
> TRUSTEE:  Okay. What was the deal?
> MR. CUSSON:  There was no deal.  He was an acquaintance.  We've done - - he's really friendly with the guys from Outback Engineering, which is Jim

---

[6] The transcript of the Second 341 Meeting contains an incorrect spelling of Maddie Drive. The Court has replaced "Maddy Drive" with "Maddie Drive."  The Court also has corrected a reference to a loss with a reference to lots, as both parties recognized the error.

Pavlik, which is the partners in Berkley Meadows [sic].  But the bank came back to us, they - - it's a long history.  The bank took the development over, didn't foreclose, said, "hey, we'll run with it, we'll complete it and, you know, you just stay over here."  And we were like, "Okay, fine, works for us."

And then, like, two years later, they said, "This sucks  We realize why you didn't want to do it." They said, "Do you have anyone that will buy it?"  And then we said, "Yea, well, maybe if we could" - - they said, "If you get someone to buy it, we'll release you from everything."  And then it ended up not buying it, having to buy out the mortgage.

TRUSTEE: Okay. So you got a release, David Peck got the property?

MR. CUSSON: Yup.

TRUSTEE:  You got a release?

MR. CUSSON:  Yes.

TRUSTEE: The other people, they got releases?

MR. CUSSON: The other - - those were already - - they were already gone.

TRUSTEE: Okay.  How many - - now, Colby Village, was it a development to build - - what kind of development was it?

MR. CUSSON: It was a subdivision to build, so you had to, you know, had to put in a road to build houses.

TRUSTEE: Were you selling off, as you say, buildable lots or packages?

MR. CUSSON: No, we were selling packages at the time.  Well, we were selling lots in a package, but they weren't being built by Colby Village; they were being built by Delphic Homes.  So the buyer would get a construction loan, they would take down the land and they pay Delphic Homes to do the construction.

TRUSTEE:  And when was the last lot sold prior to the foreclosure by Maddie Drive Realty?

MR. CUSSON: Three or four years earlier, five years earlier.

TRUSTEE: So it's been sort of sitting there?

MR. CUSSON:  It sat there for awhile.

TRUSTEE: How many lots were still unsold at the time of the foreclosure?

MR. CUSSON:  Three

TRUSTEE: And what kind of agreement did you or your father have with David Peck or Maddie Drive regarding the disposition of his lots?

MR. CUSSON:  Nothing, no agreement, no.

TRUSTEE: Nothing at all?

MR. CUSSON:  No, we were going to assist with him, yeah.

TRUSTEE:  How were you going to assist with him?

MR. CUSSON: Well we signed - - we agreed not to fight the foreclosure.

TRUSTEE:  Okay.  So, in other words, not assist as in do the buildings or broker them or - -

MR. CUSSON: No.

16

TRUSTEE: - - find buyers?

MR. CUSSON: No.

TRUSTEE:   Okay.  And no discussions over the disposition of those properties?

MR. CUSSON: No.

TRUSTEE: What about your wife?

MR. CUSSON: She ended up buying one of the lots from him.

TRUSTEE: Okay. And how did that - - - tell me about that.

MR. CUSSON:  She purchased a lot from him.  He sold her a lot after the sale of the foreclosure [sic].

TRUSTEE: Did you make the arrangement for her to buy the lot before the foreclosure took place?

MR. CUSSON: No, he just did a nice thing for us afterwards and sold her a lot.

TRUSTEE:  How much did he sell her a lot for?

MR. CUSSON: I think one dollar.

TRUSTEE: Why did he do that?

MR. CUSSON:  He's a nice - - we helped him a lot with it. We still helped him with it, with all the plans and everything afterwards.  He was under no obligation to do anything.

TRUSTEE:  So, basically, he gave her a gift.

MR. CUSSON:  Well, we gave him a gift too; he bought the subdivision for $20,000, foreclosed, since sold two lots, right after the foreclosure, sold two lots - -

TRUSTEE:  He bought the mortgage from Community Bank for $20,000"?

MR. CUSSON:  I'm sorry, yeah.  Wiped out the second mortgage-holder and then sold both lots for $55,000 apiece.

In 2009, CBS Consulting Associates, Inc. owned a 25% interest in Commodity Management.  In June of 2009, Commodity Management, sold a trucking contract.  CBS Consulting Associates, Inc. received from Commodity Management the following sums from the sale of the contract:  in 2009, $118,111 in distributions; in 2010, $102,855 in distributions; and in 2011, $11,500 in distributions.

At the Second 341 Meeting, the Trustee asked the Debtor about "CBS Consulting Associates," without distinguishing between the corporation and the limited liability company.  As noted above, the parties agreed that the Debtor also did not distinguish

17

between the two entities and maintained a checking account at Bank of America, N.A. in

the name of CBS Consulting Associates, Inc.

At the Second 341 Meeting, the Trustee asked the Debtor about Commodity

Management LLC., stating "What's Commodity Management?"  The Debtor responded:

"Oh, that was a - - I asked my accountant about that, because I wasn't even sure.  It's a

pass-through entity or something that rolled up to CBS, I guess."  Thereafter, the Trustee

conducted the following examination:

> TRUSTEE: What did it own?
> MR. CUSSON: Nothing.
> TRUSTEE:  In 2009, there was a $214,000 capital gain that came out of Commodity Management, LLC.
> MR. CUSSON: Well, a cap - - ordinary income, wasn't it?
> TRUSTEE: Capital gain.
> MR. CUSSON:  I don't know, I have - - I'd have to check, but I can get - - I can get an answer from him [the accountant].
> TRUSTEE: Commodity Management have something it sold in 2009?
> MR. CUSSON:  I got income from it in 2009, but I though it was ordinary income.
> TRUSTEE:  And what's YAM, LLC?
> MR. CUSSON: Same thing.
> TRUSTEE: And what did YAM, LLC do?
> MR. CUSSON:  Nothing; it was just a holding company, I believe.
> TRUSTEE: But what did it hold?
> MR. CUSSON: Nothing.  It just provided contracting services.  I tried to ask my accountant, because I knew you would ask these questions, and I just don't understand.  I mean I can get him in here.
> TRUSTEE:  Did either of those two companies have their own bank accounts?
> MR. CUSSON:  No. Not that I'm aware of.  I didn't have anything to do with those companies.
> TRUSTEE:  But they're listed as assets of CBS Consulting Associates.
> MR. CUSSON: Yeah, I don't - - I truthfully don't understand it.  I will get my accountant in here to explain it, because I tried to understand it.  When I was going through the taxes and looking at all the different entities we had to provide tax returns to, I saw that on one of the returns and I was like,

I called him, I said, "What are these?"  And he said, "Those are the pass-through entities."

The Trustee requested that the Debtor provide copies of tax returns for Commodity Management for tax years 2010 through 2012, and continued to seek an explanation regarding Commodity Management's business affairs and its relationship to the Debtor.  The Trustee eventually conducted a Rule 2004 examination of the Debtor's accountant, Howard Newburg ("Newburg") of Newburg & Company, LLP, and obtained an explanation.  Although the Trustee complained that the Debtor did not provide the explanation, the Debtor, in fact, testified that his accountant was the person most knowledgeable about Commodity Management. The Trustee did not ask the Debtor for the name, address or phone number of his accountant, electing to conduct a Rule 2004 examination of Newburg instead, without providing notice of the date and time of the deposition to Attorney Czerwonka.[7]

Newburg attempted to explain, with reference to, among other exhibits, a June 2009 Asset Purchase Agreement between Atina's Trucking Corp. ("Atina"), on the one hand, and Boro Recycling, Inc. and MTL Associates, Inc., on the other, that Commodity Management was a company that owned a trucking contract in New York, specifically

---

[7] Although Attorney Czerwonka received electronic notice that the Trustee had filed a Motion for Authority to Conduct an Examination of Howard M. Newburg pursuant to Rule 2004, the Motion did not contain the date and time of the examination.  The Trustee sought to examine Newburg about the Debtor's financial interest in Commodity Management and YAM, Inc. and CBS Consulting Associates, Inc. and, inferentially, matters affecting the Debtor's discharge. The Trustee's failure to provide notice of the date and time of the examination to Attorney Czerwonka was discourteous, if not unethical.

an agreement dated August 1, 2007 between Parallel Products of New England, Inc. ("Parallel Products") and Atina. The contract provided for Parallel Products to utilize the transportation services of Atina. The contract was an asset of Atina, which was "in the business of providing pick-up and delivery services, including trucking and transportation services of Used Beverage Containers ("UBC")" and was a motor carrier. Parallel had a contract with Coco-Cola to perform pick-up and delivery services of UBC to and from third parties, and Parallel and Atina were parties to a Motor Carrier Agreement pursuant to which Atina performed pick-up and delivery services of UBC pursuant to Parallel's contract with Coco-Cola. Newburg testified that Commodity Management was entitled to fees from the trucking contract and when the contract was sold for approximately $1,150,000, Commodity Management received sale proceeds, some of which were disbursed to CBS Consulting Associates, Inc. as one of four members of Commodity Management. Newburg was the manager of Commodity Management and prepared all its tax returns.

At the Second 341 Meeting, which was held on February 27, 2014, the parties agreed that "the Trustee requested that the Debtor provide by April 4, 2014, a copy of the original operating agreement for CBS Consulting Advisors, Inc. [sic]." The parties also agreed that "[o]n March 31, 2014, the Trustee again requested that the Debtor provide by April 4, 2014, a copy of the original operating agreement for CBS Consulting Advisors, Inc. [sic]." On April 9, 2014, the Debtor informed the Trustee, through Debtor's counsel, that "he does not have access to any of the records of Commodity Management and

20

therefore cannot provide you with the requested records. We are still trying to determine

what this entity is and how it appeared on his tax return."[8]

In January and February of 2014, Attorney Czerwonka was unavailable for

personal reasons. At the end of March, Attorney Czerwonka advised the Trustee that he

was still "catching up" on his work. Between April and early June of 2014, Attorney

Czerwonka and the Debtor attempted to comply with the Trustee's requests for

documents.  Email exchanges between Attorney Czerwonka and the Trustee establish

---

[8] In their Joint Pretrial Memorandum, the parties agreed to the following:

> On April 20, 2014, the Debtor provided the Trustee with an unsigned affidavit stating that "[t]o the best of my knowledge and belief, CBS Consulting owned a portion of Commodity Management, LLC until some point in late 2009. My memory on this issue is not accurate. . . ."  On April 11, 2014, the Debtor provided the Trustee an unsigned letter claiming that he did not have any Federal income tax returns for Commodity Management, LLC for tax years 2010 through 2012, or bank statements for Commodity Management, LLC.  The Debtor provided another copy of that unsigned letter on April 14, 2014.  On May 23, 2014, the Trustee again requested from the Debtor copies of tax returns and bank statements for Commodity Management, LLC.  On May 23, 2014, the Trustee again requested from the Debtor the original operating agreement for CBS Consulting Advisors, Inc. [sic]  On May 23, 2014, the Trustee requested that the Debtor provide by May 30, 2014, an explanation, dated and under oath, as to his relationship with Commodity Management, LLC.  On May 23, 2014, the Trustee also requested that any representations made by the Debtor regarding the availability or non-existence of any of the requested records "be dated and signed under the penalties of perjury."
> On June 3, 2014, the Trustee filed a "Trustee's Motion for Turnover of Debtor's Financial Documents and Vehicles" requesting, inter alia, a "written explanation, dated and signed under oath by the Debtor, as to the Debtor's relationship with Commodity Management, LLC and Yam, LLC."

(paragraph numbers omitted).

that the Debtor endeavored to comply with all of the Trustee's requests for information to the extent he was able.[9]

On June 20, 2014, the parties agreed that "the Debtor provided the Trustee with a statement, signed under the penalties of perjury, stating that he could not locate the original operating agreement for CBS Consulting Advisors, Inc. [sic]."  In addition, they agreed that "[o]n June 20, 2014, the Debtor provided the Trustee with a statement, signed under the penalties of perjury, stating with respect to his relationship with Commodity Management only that 'As far as I recall CBS owned a portion of Commodity Management up until some point in late 2009 (I could be totally wrong).  In 2010 CBS was strictly providing consulting services.'"  In an affidavit, the Debtor also indicated that his memory was not accurate and that Newburg, whose contact information he provided to the Trustee, had the most knowledge of that entity.

At the trial, the Trustee testified as to his belief that the Debtor did not distinguish between CBS Consulting Associates, LLC and CBS Consulting Associates, Inc., although CBS Consulting, Inc. was identified as a member of Commodity Management and the proposed buyer of a lot in Colby Village.  The Trustee testified that he considered the Debtor to have used CBS Consulting Associates, Inc. as an alter ego.  The Debtor testified that he did not distinguish between the two entities and that originally he was the sole member and manager of CBS Consulting Associates, LLC.  As noted above, that entity's

---

[9] Notably, the Trustee did not seek to deny the Debtor's discharge under 11 U.S.C. § 727(a)(4)(D)(withholding recorded information, including books, documents, records, and papers relating to the debtor's property or financial affairs) or 11 U.S.C. § 727(6)(A)(failure to obey any lawful order of the court).

operating agreement was amended on November 14, 2011 to add and denominate

Jennifer Cusson as the holder of a 95% membership interest.

With respect to the Colby Village lot, the Trustee testified that he believed that Lot

4A was property of the estate, which he could recover as a fraudulent transfer.  He stated:

> I think the concept that he thought that somehow this was -- it didn't
> involve him at all and that he had no interest in that asset is belied by all of
> the emails that he had had with Mr. Zajac – . . . -- where they're clearly
> talking -- they're clearly talking about a transfer into CBS Associates, him
> originally, and it seems clear that they didn't decide the transfer to Mrs.
> Cusson until the last minute.
>
> ***
>
> But whether or not he believed that it wasn't property of the estate doesn't
> mean it wasn't. The reality is CBS Associates, Inc., was owned by him 100
> percent and it was -- and it also continued to be -- even at periods of time
> when supposedly his wife owned a 97 [sic] percent interest is – you know,
> his payments were going into it.

In response to the Trustee's answers, counsel to the Debtor, on cross-examination

asked the Trustee where Lot 4A should have been listed on his schedules or statements

of financial affairs.  Although the Trustee admitted that the Debtor listed CBS Consulting

Associates, Inc. on Schedule B, the Trustee responded:  "[I]t It should have been listed --

if it was not actually listed on Schedule A, it should have been disclosed as a transfer

within two years prior to the filing."  The following colloquy then occurred:

> Q. . . . So a careful attorney, you're saying, would have disclosed on SOFA
> [statement of financial affairs, question] 10 the transfer, is that what you --
> A. I believe so.
> Q. I see.  And what would a careful attorney have described -- put on SOFA
> 10, that he transferred from himself to his wife Lot 4A?
> A. He transferred a -- disclosed that there was a transfer from -- I don't
> know how they would have disclosed it.
> Q. Well, you were careful –
> A. In some way I think they would have provided some notice.

Q. So your problem with Mr. Cusson with respect to the Colby Village transfer was he should have known to put it somewhere on SOFA 10 in a manner that you, the careful attorney, wouldn't even know how to disclose it?
A. That's not my real problem.
Q. That's one of your problems?
A. It concerns me, but it's not my real problem.
Q. What's the real problem?
A. My real problem is he lied at his 341 about his relationship with Mr. Peck and the transactions.

Following that colloquy, the Trustee admitted to employing a strategy of entrapping debtors by leading them with generalized questions. The Trustee stated that because he knew about Maddie Drive and the so-called "friendly" foreclosure, he sought to elicit details about the foreclosure from the Debtor. Although the Debtor disclosed the friendly foreclosure and the sale of Lot 4A by Maddie Drive to his spouse for one dollar, the Trustee was unsatisfied with "the unwinding of the testimony." In response to questions from the Debtor's attorney, he testified as follows:

Q. So that transaction, in your mind, is concealing the transfer?
A. I think that is indicative of somebody who wants me to think that this was an arm's-length transaction or there was consideration paid, but does not want me to know that it was a transaction that was linked to a prior agreement.

*** 

Q So -- all right, so just again in narrowing what we're arguing about, that is the crux of the case with respect to Maddie Drive; he lied at his 341 meeting about the relationship with Mr. Peck and about the -- and about the consideration, if you will, for the sale of the Maddie Drive property?
A. Yeah. My primary concern. My belief in terms of filing a complaint was that he did not want me to know about that transaction and that his testimony was based and was guided by a desire that I not be aware of that transaction.

24

With respect to Commodity Management from which the Debtor received approximately

$11,500 in 2011, the Trustee testified as follows on cross-examination:

> Q. So was there a place in your mind on the schedules or the Statement of
> Financial Affairs where that sale in 2009 should have been disclosed?
> A. Not the sale. Possibly the 2011 income should have been included in
> Statement of Financial Affairs question number two, but I would
> understand that some people might disagree with that.

<p style="text-align:center">***</p>

> Q. Do you know that it wasn't included in that? He listed all of his income
> in 2011 from his tax return, right?
> A. I understand what you're saying.
> Q. And that would have included that $11,000 from the K-1.
> A. I -- I'll concede that -- well, I see what you're saying that in the Statement
> of Financial Affairs question two there's not a proper breakdown of the
> sources of the income.

<p style="text-align:center">***</p>

> Q . . . So the only possible placement Commodity Management should have
> been on the schedules or SOFA would have been potentially a breakdown
> of the $11,000 into question two instead of question one?
> A. Yes.

The Trustee testified that it was his understanding that the Debtor was receiving

approximately $5,000 per month from the contract.  When it was sold, he received $64,000

deposited into his checking account in 2009.  The contract ceased in 2009 and the payment

stream stopped in 2011.   The Trustee responded as follows to a series of questions by

Debtor's counsel:

> Q. So going back to my question, what is it that he concealed about that?
> He admitted to making the money. He didn't know that it was a capital
> gain or earned income. I'll grant you that. But he said, "I made the money."
> A. It's my belief that he certainly -- I believe that he certainly knew what
> this was. I find it extremely hard to understand how somebody can receive
> that much money and even though it is four years later not have a clue what

<p style="text-align:center">25</p>

> it's for.  And then I -- over the next three months before I filed the 2004 exam
> and the motion for turnover, that's over a three- month period, I had been
> trying to obtain an explanation and I had yet to receive anything that was
> useful in helping me as a trustee understand what that transaction was.

Because the Debtor testified that he did not understand the financial implications of his

interest in Commodity Management, the Trustee complained:

> I understand that he told me Mr. Newburg knows, but I -- he can -- he had
> an opportunity to call his accountant.  He testified at certain points that he
> had talked to his accountant and he still hadn't been able to give me an
> explanation. At the 341 meeting he claimed he had talked to his accountant
> and he still didn't know what it was. Frankly, I really didn't think I was
> likely to get an accurate answer from the accountant except under subpoena
> and I was trying to get the information without having to take those steps.

The Trustee, however, admitted Commodity Management was not an estate asset and

there was no value to it.  He also admitted that, despite the Debtor's testimony at the

Second 341 meeting that he lacked understanding of Commodity Management's

investment, the Trustee did not believe him.

Attorney Czerwonka testified that he was aware of Jennifer Cusson's ownership

interest in Lot 4A. He stated that after asking the Debtor a number of questions, he

"determined that his wife was the only person who had an interest in the property, that

he [the Debtor] never acquired and never transferred any interest in that property to her,

so it would not be an asset that should be included on his bankruptcy."  He also testified

that boxes of documents were forward to the Trustee, concluding "I think we complied

with every request of the Trustee. I don't know what more to say.  I mean, when the

request would come in we would analyze it and get the documents," adding that the

Debtor cooperated with him:  "I never got a no."

## III. POSITIONS OF THE PARTIES

A. <u>The Trustee</u>

The Trustee argues that the Debtor concealed the bankruptcy estate's interest in Lot 4A, Maddie Drive and knowingly and fraudulently made a false oath regarding the transfer.  In addition, the Trustee contends that the Debtor knowingly made a false oath or account regarding his interest in Commodity Management.

With respect to Maddie Drive, the Trustee argued as follows:

> At no point during the examination did the Debtor disclose the details of the prior arrangements with Mr. Peck. The Trustee did not obtain that information until after he subpoenaed the relevant records from Mr. Peck and they were provided by Mr. Zajak [sic] [TT Day 1, 158:3-8]. In response to the subpoena Mr. Zajak [sic] provided, among other things, the emails identified as Exhibits 12 and 16; these emails were not provided by the Debtor [TT Day 1, 158:3-8]. After filing his objection to the Debtor's discharge, the Trustee requested, pursuant to Rule 7034, that the Debtor produce all correspondence, including emails, since January 1, 2001 relating to Colby Village, LLC, David Peck or Maddie Drive Realty Associates. The Debtor did not produce any emails, and at a July 9, 2015 deposition, the Debtor testified he had lost all of his emails from before April 2014 due to a system malfunction [Exhibit 28, 31:16 – 35:23].

The Trustee contends that because the Debtor was involved in "multiple lawsuits" since 2009, although the record reflects only lawsuits involving the Novicks and National Lumber, he was "engaged in a course of conduct designed to hide assets from his creditors."   The Trustee further argues that the Debtor's answers to questions were evasive and untruthful and that the false oaths were material, such that he was able to fashion a fraudulent transfer claim against Jennifer Cusson and to recover Lot 4A for the

benefit of the estate.  He further contends that, by failing to list Lot 4A on his schedules

or statement of financial affairs, the Debtor concealed assets.

With respect to Commodity Management, the Trustee makes the following

argument:

> The Debtor fraudulently and knowingly made a false oath or account
> regarding Commodity Management, LLC. At the 341 meeting the Debtor
> did not provide an accurate account of what Commodity Management was
> or why it paid CBS Consulting Associates, Inc. large sums in 2009 and 2010.
> The Debtor further failed to assist the Trustee in his efforts to understand
> the Commodity Management transactions, as well as other aspects of his
> financial affairs, requiring the Trustee to file a motion for turnover and
> multiple motions for authority to conduct Rule 2004 examinations.

The Trustee adds that because the Debtor could testify competently about Commodity

Management at trial this demonstrates that the 2009 contract sale and the relationship

between Commodity Management and CBS Consulting Associates, Inc. "was not above

his comprehension."   Accordingly, the Trustee argues that "it is implausible that the

Debtor could not provide accurate and complete testimony at the Second 341 Meeting."

He adds: "[t]he subsequent failure to provide the Trustee with an accurate explanation

despite multiple requests allows for the inference that the Debtor deliberately chose not

to provide the Trustee with an accurate account and by itself provides a basis for denial

of the discharge."

B. The Debtor

The Debtor maintains that the Trustee failed to sustain his burden of proof with

respect to concealing either Lot 4A or CBS Consulting Associates, Inc.'s interest in

Commodity Management.  He argues that he did not conceal an interest in Lot 4A, and

28

there was no place to list the transfer of Lot 4A on his schedules and statement of financial affairs. In addition, he asserts that he did not lie at the Second 341 Meeting about his arrangements with Peck. Moreover, the Debtor asserts that he was under no obligation to include Commodity Management in his schedules as CBS Consulting Associates, Inc. owned the interest in Commodity Management, and he reported the income he received from that entity in his statement of financial affairs in question 1.

Similarly, the Debtor contends that the Trustee failed to sustain his burden that he made a false oath at his Second 341(a) Meeting. The Debtor argues as follows:

> In the present case, the Trustee has now conceded that Cusson did not fail to disclose any assets or transfers of assets on his Schedules or Statement of Financial Affairs. His sole argument in favor of nondischargeability is that Cusson was untruthful in response to a question raised by the Trustee in the Section 341 meeting. But, Cusson was honest in his testimony. The Trustee's claim that he was not honest is based solely on the Trustee's *conjecture* that it was only the Trustee's examination strategy that brought out the truth from Cusson. The evidence shows otherwise. . . . Cusson did not play fast and loose with either his bankruptcy pleadings or his testimony. He was honest, and he and his bankruptcy counsel took on an unusual and unnecessary barrage of document and information requests from the Trustee, and provided all of the information that the Trustee requested, fully disclosing his financial condition and history to the Trustee's satisfaction. As set forth fully herein, the Trustee has failed to meet his burden, and Cusson is entitled to his discharge.

The Debtor specifically argues as follows with respect to the Trustee's contentions that he lied under oath and concealed the transfer of Lot 4A:

> At the second 341 meeting, Cusson and the Trustee engaged in a colloquy regarding Colby Village during which the Trustee asked Cusson about agreements or conversations he had regarding the "disposition" of the properties. The context of that colloquy was aimed at identifying any agreements or discussions that Cusson may have had regarding building or brokering the Colby Village lots for Peck. (Tr. I 34:2-19.)

When the Trustee asked Cusson "what kind of agreement did you or your father have with David Peck or Maddy [sic] Drive regarding the disposition of his lots," Cusson's response that there was no agreement (Tr. I 34:2-5) was both truthful and accurate because no agreement was ever formalized between the parties.

When the Trustee then asked Cusson whether he and Peck had "discussions over the disposition of those properties," Cussons's response that there were no discussions regarding the disposition of the properties (Tr. I 34:2-19) was also truthful and accurate because Cusson understood the Trustee's question as an inquiry into whether there were ever discussions regarding Cusson brokering the properties for Peck (Tr. II 42:3-8; 53:1-9; 54:14-20; 55:5-18), and no such discussions had ever occurred.

Although the Trustee argues that this answer was intened [sic] to conceal the Maddy [sic] Drive Property transaction, Cusson's answers to the next set of questions, which related directly to that transfer, demonstrate that Cusson had no intention of concealing, and in fact did not conceal, the transaction. Cusson's answers to the Trustee's questions directly acknowledged and described the transfer of the Maddy [sic] Drive Property from Colby Village to Cusson's wife.

(paragraph numbers omitted). The Debtor adds that even if he or CBS Consulting Associates, Inc. had transferred Lot 4A, the agreement contemplated by the October 17, 2011 purchase and sale agreement was two years old as of the petition date, and, therefore, it was not required to be disclosed on the statement of financial affairs. The Debtor also highlights that he never had an interest in Lot 4A so there was no requirement that it be listed on Schedule A, and he did list CBS Consulting Associates Inc., which entity would have had an interest in a Colby Village lot if the plan with Peck had been consummated.

With respect to Commodity Management, the Debtor states unequivocally that "[i]t is uncontroverted that Commodity Management was a passive investment of CBS [Consulting Associates, Inc.] that had terminated in 2009, yielded no income since  2011

. . . and owned nothing as of the Petition Date" and that "the Trustee conceded that, aside

from including the pass through income from the sale of the Commodity Management

contract on the Statement of Financial Affairs question 1 as part of his 2011 income (which

he did), Cusson was under no obligation to include Commodity Management anywhere

else on his schedules or Statement of Financial Affairs." The Debtor also contends that he

was unable to provide more than general information because he did not have detailed

knowledge of, or possession of the tax returns filed by, Commodity Management.

## IV. DISCUSSION

A. <u>Applicable Law</u>

The Trustee seeks to deny the Debtor a discharge under 11 U.S.C. § 727(a), which

provides in relevant part the following:

(a) The court shall grant the debtor a discharge, unless—

> (2) the debtor, with intent to hinder, delay, or defraud a
> creditor or an officer of the estate charged with custody of
> property under this title, has transferred, removed,
> destroyed, mutilated, or concealed, or has permitted to be
> transferred, removed, destroyed, mutilated, or concealed - -
> . . .

> > (B) property of the estate, after the date of the
> > filing of the petition; . . .

> (4) the debtor knowingly and fraudulently, in or in connection
> with the case— . . .

> > (A) made a false oath or account; . . . .

11 U.S.C. § 727(a).  Because section 727(a) of the Bankruptcy Code "imposes an extreme

penalty for wrongdoing," it "must be construed strictly against those who object to the

debtor's discharge and 'liberally in favor of the bankrupt.'" State Bank of India v. Chalasani In re Chalasani), 92 F.3d 1300, 1310 (2d Cir. 1996) (quoting Bank of Pennsylvania v. Adlman (In re Adlman), 541 F.2d 999, 1003 (2d Cir. 1976)).  Moreover, the party objecting to discharge must establish the elements by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 286 (1991); Groman v. Watman (In re Watman), 301 F.3d 3 (1st Cir. 2002).[10]

With respect to 11 U.S.C. § 727(a)(2)(B), "[t]o prevail under Section 727(a)(2)(B), the party objecting to discharge must demonstrate: (1) that the debtor, (2) transferred or concealed, (3) property of the bankruptcy estate, (4) with the intent to hinder, delay or defraud the creditor, (5) after the filing of the bankruptcy petition. Pisculli v. T.S. Haulers, Inc. (In re Pisculli), 426 B.R. 52, 59 (E.D.N.Y. 2010), aff'd, 408 F.App'x 477 (2d Cir. 2011) (citing Adams v. Bostick (In re Bostick), 400 B.R. 348, 356 (Bankr. D. Conn. 2009)).

With respect to claims under 11 U.S.C. § 727(a)(4)(A), the United States Court of Appeals for the First Circuit has addressed the legal standards applicable to a debtor's

---

[10] The United States Court of Appeals for the First Circuit stated:

> Thus, in order for a debtor to be denied a discharge under § 727(a)(2), an objector must show by a preponderance of the evidence that (1) the debtor transferred, removed, destroyed, mutilated, or concealed (2) his or her property (or the property of the estate if the transfer occurs post-petition) (3) within one year of the petition filing date (for prepetition transfers) (4) with intent to hinder, delay or defraud a creditor. R.I. Depositors Economic Protection Corp. v. Hayes (In re Hayes), 229 B.R. 253, 259 (B.A.P. 1st Cir. 1999). Grounds for discharge are construed liberally in favor of the debtor. See Commerce Bank & Trust Co. v. Burgess (In re Burgess ), 955 F.2d 134, 137 (1st Cir. 1992).

In re Watman, 301 F.3d at 7.

knowing and fraudulent false oaths made in conjunction with schedules and the

statement of financial affairs in <u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106 (1st Cir. 1987).

It stated:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i)
> knowingly and fraudulently made a false oath, (ii) relating to a material
> fact. The burden of proof rests with the trustee, <u>In re Shebel</u>, 54 B.R. 199, 202
> (Bankr. D. Vt. 1985), but "once it reasonably appears that the oath is false,
> the burden falls upon the bankrupt to come forward with evidence that he
> has not committed the offense charged." <u>Matter of Mascolo</u>, 505 F.2d 274,
> 276 (1st Cir. 1974).  The statute, by its very nature, invokes competing
> considerations. On the one hand, bankruptcy is an essentially equitable
> remedy. As the Court has said, it is an "overriding consideration that
> equitable principles govern the exercise of bankruptcy jurisdiction." <u>Bank
> of Marin v. England</u>, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).
> In that vein, the statutory right to a discharge should ordinarily be
> construed liberally in favor of the debtor. <u>Matter of Vickers</u>, 577 F.2d 683,
> 687 (10th Cir. 1978); <u>In re Leichter</u>, 197 F.2d 955, 959 (3d Cir.1952), *cert.
> denied*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); <u>Roberts v. W.P. Ford
> & Son, Inc.</u>, 169 F.2d 151, 152 (4th Cir. 1948). "The reasons for denying a
> discharge to a bankrupt must be real and substantial, not merely technical
> and conjectural." <u>Dilworth v. Boothe</u>, 69 F.2d 621, 624 (5th Cir. 1934). On
> the other hand, the very purpose of certain sections of the law, like 11 U.S.C.
> § 727(a)(4)(A), is to make certain that those who seek the shelter of the
> bankruptcy code do not play fast and loose with their assets or with the
> reality of their affairs. The statutes are designed to insure that complete,
> truthful, and reliable information is put forward at the outset of the
> proceedings, so that decisions can be made by the parties in interest based
> on fact rather than fiction. As we have stated, "[t]he successful functioning
> of the bankruptcy act hinges both upon the bankrupt's veracity and his
> willingness to make a full disclosure." <u>Mascolo</u>, 505 F.2d at 278. Neither the
> trustee nor the creditors should be required to engage in a laborious tug-of-
> war to drag the simple truth into the glare of daylight. *See* <u>In re Tabibian</u>,
> 289 F.2d 793, 797 (2d Cir.1961); <u>In re Shebel</u>, 54 B.R. at 202. The bankruptcy
> judge must be deft and evenhanded in calibrating these scales.

<u>In re Tully</u>, 818 F.2d at 110.  In <u>U.S. Trustee v. Sohmer (In re Sohmer)</u>, 434 B.R. 234 (Bankr.

D. Mass. 2010), this Court observed that "[c]ircumstantial evidence may be used to prove

fraudulent intent that the cumulative effect of false statements may, when taken together,

evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." 434 B.R. at 250 (citing Sholdra v. Chilmark Fin. LLP (In re Sholdra), 249 F.3d 380, 383 (5th Cir. 2001), *cert. denied* 534 U.S. 1042 (2001)). This Court, citing the United States Court of Appeals for the Fifth Circuit in Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992), added that false statements in the debtor's schedules or false statements made by the debtor during the proceedings are sufficient to justify denial of discharge and that the materiality of an omission is not solely based on the value of the item omitted or whether it was detrimental to creditors because the statement need only "'bear [ ] a relationship to the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of his property.'" In re Sohmer, 434 B.R. at 250 (quoting Beaubouef, 966 F.2d 178, and Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 617 (11th Cir. 1984)).

B. Analysis

1. Lot 4A, Maddie Drive

The Trustee's claims against the Debtor with respect to Lot 4A are tenuous at best and frivolous at worst. In the first place, they are predicated upon several assumptions that were not expressly pled in his First Amended Complaint. The Trustee's claims are predicated upon a determination that the Debtor was the alter ego of both CBS Consulting Associates, Inc. and CBS Consulting Associates, LLC and that the organizational form of both entities must be disregarded, as well as Jennifer Cusson's 95% membership interest in the limited liability company. The Trustee's claims also assume an enforceable contract for the sale of Lot 4A between Maddie Drive and the

Debtor, although the October 17, 2011 purchase and sale agreement was between Maddie

Drive Realty Associates, LLC and CBS Consulting Associates, Inc.

As noted by the court in Shaw v. Bank of Am., N.A., Civil No. 10-cv-11021, 2015

WL 224666 (D. Mass. Jan. 15, 2015), "[t]he statute of frauds provides that '[n]o action shall

be brought . . . [u]pon a contract for the sale of lands . . . or of any interest in or concerning

them . . . [u]nless the promise, contract or agreement upon which such action is brought,

or some memorandum or note thereof, is in writing and signed by the party to be charged

therewith or by some person thereunto by him lawfully authorized.'" Id. at *8 (citing

Mass. Gen. L. c. 259, § 1).   Admittedly Peck, on behalf of Maddie Drive, executed the

purchase and sale agreement, as Seller, on or around October 17, 2011, but CBS

Consulting Associates, Inc., the ostensible Buyer, was dissolved in June of 2012,

approximately six months after the purchase and sale agreement was executed.   It is

unclear and unaddressed by the Trustee whether the Debtor, individually, would have

been able to enforce the contract in view of Mass. Gen. Laws ch. 156B, § 102.[11]  Although

---

[11] Section 102 provides:

> Every corporation whose corporate existence for other purposes is
> terminated (1) by dissolution under the provisions of section ninety-nine,
> one hundred, or one hundred and one, (2) by the expiration of the period
> for its duration limited by its articles of organization, or (3) in any other
> manner, shall nevertheless be continued as a body corporate for three years
> after the time when its existence is terminated, for the purpose of
> prosecuting and defending suits by or against it and of enabling it gradually
> to settle and close its affairs, to dispose of and convey its property to any
> person and to make distributions to its stockholders of any assets remaining
> after the payment of its debts and obligations, but not for the purpose of
> continuing the business for which it was established; provided, that the
> corporate existence of such a corporation, for the purposes of any suit

the Trustee has asserted that the Debtor was the alter ego of CBS Consulting Associates, Inc., there was no evidence that other creditors viewed that entity that same way, or that the Debtor could engage in reverse veil piercing with respect to CBS Consulting Associates, Inc.'s corporate veil. *See generally* <u>Butler v. Candlewood Road Partners, LLC (In re Raymond)</u>, 529 B.R. 455, 473-76 (Bankr. D. Mass. 2015).[12]   Thus, for the Trustee to prevail on his concealment and false oath theories with respect to Lot 4A, Maddie Drive, the Debtor intuitively would have had to have known, at the time he filed his schedules and statement of financial affairs, 1) that he was the actual owner of Lot 4A, although he never held title to it and arguably could not have compelled Maddie Drive to convey it to him directly, 2) that he transferred Lot 4A to his spouse, although he could not and did

---

brought by or against it prior to the commencement of, or during, said period of three years, shall continue beyond said period for a further period of ninety days after the final judgment in the suit.

Mass. Gen. Laws ch. 156B, § 102.

[12]  In <u>In re Raymond</u>, this Court observed:

There are few reported decisions addressing the availability of the reverse veil piercing doctrine under Massachusetts law, and those that do, reject reverse veil piercing when insiders attempt to reverse pierce corporate veils. *See, e.g.*, <u>McCarthy v. Azure</u>, 22 F.3d 351, 363 (1st Cir.1994); <u>Spaneas v. Travelers Indem. Co.</u>, 423 Mass. 352, 354, 668 N.E.2d 325 (1996); <u>Berger v. H.P. Hood, Inc.</u>, 416 Mass. 652, 657–58, 624 N.E.2d 947 (1993); <u>Gurry v. Cumberland Farms, Inc.</u>, 406 Mass. 615, 626, 550 N.E.2d 127 (1990); <u>McBirney v. Paine Furniture Co.</u>, 1999 WL 1411359, at *11 (Mass. Super. Dec. 10, 1999).  The Supreme Judicial Court has never explicitly, or even inferentially, adopted reverse veil piercing in any form and, as noted above, has indicated the well-accepted remedy of veil piercing should rarely be applied.

<u>In re Raymond</u>, 529 B.R. at 473-76 (footnotes omitted).

not execute a deed transferring Lot 4A to her as he did not hold title to the property pursuant to the purchase and sale agreement, and 3) that he then knowingly and fraudulently failed to list ownership of Lot 4A on Schedule A or the transfer on his statement of financial affairs, with the intention of concealing ownership of Lot 4A from his creditors and the Trustee.  If the Debtor did not disclose an interest in, or transfer of, Lot 4A under this far fetched scenario when he filed his schedules and statement of financial affairs, this Court is not surprised as he had no obligation to do so.  Attorney Czerwonka got it right, and the Trustee's leaps of logic can neither withstand scrutiny nor form the basis of claims under 11 U.S.C. § 727(a)(2)(B) and (a)(4)(A), where § 727(a) is to be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt.  *See* In re Watman, 301 F.3d at 7; In re Chalasani, 92 F.3d at 1310; In re Burgess, 955 F.2d at 137; In re Tully, 818 F.2d at 110.

The Court also rejects the Trustee's contention that the Debtor's testimony at the Second 341 Meeting was false and can serve as a basis for the denial of his discharge.  The Court accepts the Debtor's arguments as to the truthfulness of his testimony, particularly in view of the Trustee's "gotcha" approach to examinations of debtors. The Trustee is charged with collecting and reducing to money property of the estate and investigating the financial affairs of the debtor.  *See* 11 U.S.C. § 704(1)(1) and (4).  Moreover, if it is advisable, he may oppose the discharge of the debtor.  Id. at § 704(a)(6).  As the Debtor observed, however, the Trustee's interrogation technique appeared to be designed to trick the Debtor, not to obtain useful information about assets, the liquidation of which would benefit creditors.  The Trustee's amorphous questions appear merely to have

confused the Debtor.  The Debtor's responses when considered in their full context cannot

form the basis of denial of discharge.

The Trustee asked the Debtor about whether he had done business with Peck.

There was no evidence that the Debtor and Peck had a business relationship prior to the

Debtor's outreach to him with respect to the acquisition of the Community Bank

mortgage.  Although the Debtor contemplated a business arrangement, one did not come

to fruition.  The Trustee asked the Debtor about a "deal" with Peck.  The Debtor

responded that there was no deal.  Although the Trustee was asking about a deal

involving Lot 4A, the Debtor, in the absence of any written agreement, could truthfully

answer "[t]here was no deal."  The Trustee also asked the Debtor about what kind of

agreement the Debtor had with Peck or Maddie Drive.  The Debtor answered that that

there was no agreement because there was none as Peck did not contemplate engaging

the Debtor or his father to market and develop the remaining lots in Colby Village.

The Court is compelled to observe that straightforward questions might have led

to straightforward answers.  Such an approach would have significantly reduced the

potential administrative expenses of the bankruptcy estate.

### 2. The Debtor's Interest in Commodity Management

At the commencement of the case, the Debtor owned no interest in Commodity

Management.  Prior to June of 2009, Commodity Management, whose members included

CBS Consulting Associates, Inc., was entitled to fees from the trucking contract - - it was

a passive investment.  When that contract was sold for approximately $1,150,000,

Commodity Management received sale proceeds, some of which were disbursed to CBS

Consulting Associates, Inc. as a member of Commodity Management over a three year period.  The Debtor disclosed income that he received in 2011 in answer to Question 1 on the statement of financial affairs.

The Debtor's testimony at the Second 341 Meeting did not involve a false oath. First, the Debtor testified that Commodity Management owned nothing, which was true because the asset it owned had been sold.  In the second place, the Debtor testified that he didn't understand the nature of his ownership interest, and finally, he  testified that "I didn't have anything to do with those companies" and that they were "pass-through entities."  Although the Debtor testified that he could get answers from his accountant, the Court concludes that the Trustee, in an effort to conserve estate assets, could have and should have simply asked the Debtor for the contact information for his accountant and obtained the information he needed about Commodity Management from Newburg.  In view of the tenuous, if not frivolous, nature of the Trustee's claims in this adversary proceeding, the Trustee's pursuit of the Debtor in this action was overly aggressive and unreasonably zealous.  The Court concludes that the Debtor's initial testimony that he did not understand the financial arrangements involving Commodity Management was credible and truthful.

**V. CONCLUSION**

In view of the foregoing, the Court shall enter judgment in favor of the Debtor and

against the Trustee as to the remaining Counts of the Trustee's First Amended Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  September 9, 2016